Marie J. WEBER, Plaintiff,

v.

PARFUMS GIVENCHY, INC., Defendant.

No. 98CIV3436(KMW)(AJP).

United States District Court, S.D. New York.

June 1, 1999.

Thomas S. Rosenthal, New York, NY, for Plaintiff's Counsel.

Kathleen M. Kundar, Fox Horan & Camerini, LLP, New York, NY, for Defendant's Counsel.

## ORDER

KIMBA M. WOOD, District Judge.

Plaintiff brought suit under the Age Discrimination in Employment Act, 29 U.S.C.

§ 621 *et seq.* ("ADEA"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107, alleging that she was unlawfully terminated on the basis of her age. Defendant moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.

In a thorough Report and Recommendation dated March 24, 1999 (the "Report"), familiarity with which is assumed, Magistrate Judge Andrew J. Peck recommended that defendant's motion for summary judgment be denied. Defendant has filed objections to the Report. Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews de novo those portions of the Reports to which defendant objects. For the reasons stated below, the Court adopts the Report and its Recommendation.

## I. Discussion

The facts of this case are set forth in the Report and need not be repeated here. (*See* Report at 346 – 52.)

## A. The Legal Framework

### 1. Standard for Summary Judgment

On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987) (citations and internal quotation marks omitted). To prevail on a motion for summary judgment, the moving party therefore must show that there are no such genuine issues of material fact to be tried, and that he or she is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Citizens Bank of Clearwater v. Hunt,* 927 F.2d 707, 710 (2d Cir.1991). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," which includes identifying the materials in the record that "it believes demonstrate the absence of a genuine is-

sue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

Once a motion for summary judgment is made and supported, the non-moving party must set forth specific facts that show that there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although a court considering a motion for summary judgment must view all evidence in the light most favorable to the non-moving party, and must draw all reasonable inferences in that party's favor, *see Consarc,* 996 F.2d at 572, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If, based on the submissions to the court, no rational fact-finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The Court must be wary of granting summary judgment in workplace discrimination cases. Because an employer's discriminatory intent will rarely be explicit, the Court must scrutinize the record for evidence of such intent. *See Gallo v. Prudential Residential Servs. Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

### 2. Plaintiff's Burden Under the ADEA

The Supreme Court has developed a burden-shifting analysis in the context of Title VII claims, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that is equally applicable to ADEA claims. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (en banc); *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994). The ADEA prohibits any refusal to hire or discharge any individual because of that individual's age. *See* 29 U.S.C. § 623(a)(1). The protected class under the

statute are employees over 40 years old. *See id.* § 631(a). Under the burden-shifting analysis in the context of the ADEA, the plaintiff must first make out a prima facie case of discrimination. Should the employer articulate a legitimate, nondiscriminatory reason for its actions, the burden then shifts back to the plaintiff to prove that the employer's stated reason is a pretext for discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once the defendant has articulated a non-discriminatory reason, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997).

■ The elements of a prima facie claim of age discrimination based upon failure to hire are for the plaintiff to show that she belongs to the protected age group, that she was qualified for the position, that she suffered an adverse employment decision, and that the position was ultimately filled by a younger person. *See Petrelli v. City of Mount Vernon,* 9 F.3d 250, 254 (2d Cir.1993) (quoting *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991)); *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.), *cert. denied,* — U.S. —, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998).

B. Application of the Burden–Shifting Analysis

■ There is little dispute that plaintiff has met her burden of demonstrating a prima facie case of discrimination under the ADEA. At the time of her termination, plaintiff was 59 years old. (*See Report* at 346.) Defendant admits that plaintiff was a good worker with high sales figures. (*See id.* at 357.) Termination is obviously an adverse employment action. Finally, defendant replaced plaintiff with two individuals, one of whom was in her 20s and the other in her 30s. (*See id.* at 352.)

The burden therefore shifts to defendant to articulate a legitimate, non-discriminatory reason for its decision to terminate plaintiff. Defendant's stated reason is that plaintiff was causing personnel problems, prompted largely by alleged disagreements between plaintiff between Melissa Frier, a counter business manager who was 27 years old at the time of the events that gave rise to this suit. As Frier explained: "I observed [plaintiff] going to other counters, and from afar, looking at me and sometimes even pointing at me, pointing, showing another person at another counter like, 'Oh, look that's Melissa' ...." (*Id.* at 349.) When one of defendant's account executives, Stacey Hubbell, investigated the problem, she found that, "[Plaintiff] would discuss Melissa with the other girls at the counter ... instigating little problems. Just as I said, they wouldn't stand near her. They would stand together and whisper. I mean real childish behavior." (Objections at 4.) Another employee of defendant stated that she observed that:

> I observed them shying away from me now, it was no longer cool to be, you know, a team member with me anymore, in other words. They had been very cooperative in the morning and been team members with me and maybe they were humoring me, but I took that as being cooperative and all of a sudden they became frightened and kind of moved away. So I could see that Marie was a big influence on them.

(*Id.* at 6.)

The proffered justification for plaintiff's removal is, to say the least, extremely vague. The Report appears to have concluded that defendant articulated a legitimate, non-discriminatory reason for plaintiff's termination. The Court notes that in those cases in which courts have found defendants to have proffered a legitimate non-discriminatory reason for the adverse employment action, that reason has been

more substantial than conclusory assertions that plaintiff instigated a whisper campaign. *See, e.g., Hollander v. American Cyanamid Co.,* 172 F.3d 192, 1999 WL 170733, at *2 (2d Cir. Mar.29, 1999) (plaintiff left a " 'trail of wreckage' " and operated like a " 'one man gang' "); *Raskin v. Wyatt,* 125 F.3d 55, 58 (2d Cir.1997) (proffered reason was that plaintiff was " 'arrogant,' 'venal,' 'a bully,' and 'power crazy' ").

■ Even assuming that defendant has proffered a legitimate, non-discriminatory reason, the Court concludes, as did the Report, that plaintiff offered sufficient evidence of discriminatory animus behind the decision to terminate her to cast doubt on defendant's stated reason. (*See* Report at 360 – 64.) Defendant's proffered justification must be evaluated in light of plaintiff's assertions of repeated discriminatory comments. These comments include statements by Frier that she "needed to surround herself with younger people," that she could not "relate to [plaintiff] because she's old," that plaintiff was "too old for this business," that plaintiff and others "were all a bunch of old bitches," that, "[o]ld people should not be in this business," and, following plaintiff's termination, that she was "glad that old bitch [was] out of the store." (*Id.* at 348.) A rational trier of fact could find that these comments indicated that the real reason for plaintiff's termination was that certain of defendant's employees, or affiliated personnel, harbored an animus against plaintiff based on her age.

Finally, defendant also relies on plaintiff's alleged failures to ring up a sale at her counter, or to provide Frier with a chance to ring up a sale on one specific occasion. (*See id.* at 360 – 64.) Because the validity of these claims rests on factual determinations as to how busy the store was at that particular time, whether defendant's employees were available to ring up sales, and whether plaintiff made a good faith effort to ensure that one of defendant's employees rang up the sale, there are genuine issues of material fact that preclude summary judgment.

## II. Conclusion

For the reasons stated above, the Court adopts the Report and its Recommendation in full. Defendants' motion for summary judgment is denied. [Doc. No. 28] The parties shall continue to prepare for trial on the schedule previously ordered by the Court.

SO ORDERED.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Plaintiff Marie J. Weber has asserted claims of age discrimination against Parfums Givenchy, Inc., pursuant to the Age Discrimination in Employment Act, 42 U.S.C. § 621–31, and the New York City Human Rights Laws, N.Y.C. Admin. Code § 8–107, as a result of her termination by Parfums Givenchy on May 15, 1995 when she was 59 years old. Parfums Givenchy has moved for summary judgment.

For the reasons set forth below, defendant's summary judgment motion should be denied because genuine issues of material fact exist as to whether Parfums Givenchy's proffered reasons for Weber's termination were a pretext for discrimination.

### FACTS

#### Weber's Employment with Givenchy

Plaintiff Marie Weber was born on September 25, 1935. (Weber Dep. at 6.) In January 1992, at age 56, Weber was hired as a promotional model for Parfums Givenchy ("Givenchy") at Macy's Herald Square. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 5; Weber Dep. at 58–59; Hubbell Dep. at 39–41.) Givenchy is a New York corporation that sells fragrances and beauty products in department stores such as Macy's. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 1.)

A promotional model promotes the sale of Givenchy products such as perfumes

and body lotions to customers at department store counters, but is not responsible for ringing up the sale, which is done by a Macy's salesperson on the cash register at the Givenchy counter. (Givenchy & Weber Supp. 56.1 Stmt. ¶¶ 4, 6; Hubbell Dep. at 57–58; Weber Dep. at 62–63, 67–68.) The promotional model is required to "rotate sales" to each Macy's salesperson at the Givenchy counter so that each earns commissions. (Weber Supp. 56.1 Stmt. ¶ 6(a); Hubbell Dep. at 57–58; Frier Dep. at 49.) For this reason, a promotional model is often referred to as a "sales rotator." (Givenchy & Weber Supp. 56.1 Stmt. ¶ 6.)

Stacey Hubbell was the Givenchy account executive for Macy's account. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 2; Hubbell Dep. at 13.) Hubbell reported to Janet Bachman, Givenchy's field sales manager, sometimes referred to as regional manager. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 2; Hubbell Dep. at 13.) Hubbell was born in June 1967 and Bachman was born in December 1956, and, at the time Weber was fired from Givenchy in May 1995, they were 27 and 38 years old, respectively. (Weber Supp. 56.1 Stmt. ¶ 12(a)-(b); Hubbell Dep. at 5; Rosenthal Aff. Ex. C: Givenchy Int. Ans. at p. 2.)

It is undisputed that during her employment with Givenchy, Weber was considered a "very good sales rotator" (Hubbell Dep. at 52) and a "wonderful employee" (Hubbell Dep. at 69–70) who produced "great [sales] figures" (Bessemer Dep. at 40). (*See* Givenchy Reply Br. at 6.) Based on her good performance, Givenchy accorded Weber a discretionary raise in March 1995. (Weber Supp. 56.1 Stmt. ¶ 19(s); Hubbell Dep. at 66.)

Givenchy fired Weber on May 15, 1995, when she was 59 years old. (Givenchy 56.1 Stmt. ¶ 20; Weber Supp. 56.1 Stmt. ¶¶ 19(r), 20; Weber Dep. at 15.)

## The Givenchy Counter at Macy's

When Weber started to work as a Givenchy promotional model in 1992, Givenchy had a very small display case at Macy's. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 7; Weber Dep. at 64.) At that time, the counter was staffed by only one Macy's salesperson Lucille Scorzelli, who acted as the "counter manager." (Weber Supp. 56.1 Stmt. ¶ 12(c); Hubbell Dep. at 28–29.) Scorzelli was born in May 1944. (Scorzelli Dep. at 10.) As business increased at the counter, Andrea McBean was hired in 1994 as a second Macy's salesperson at the Givenchy counter. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 7; Weber Dep. at 69.) By early 1995, the Givenchy counter had become very successful, and Macy's offered Givenchy a larger and better-located counter. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 8; Weber Dep. at 64–65; Kundar 1/11/99 Aff. Ex. 49.) As a result, Givenchy decided to hire a counter business manager. (Givenchy 56.1 Stmt. ¶ 8; Weber Supp. 56.1 Stmt. ¶¶ 8, 12(d); Kundar 1/11/99 Aff. Ex. 49.)

Weber did not want this new position, but Scorzelli did. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 12; Weber Dep. at 115; Hubbell Dep. at 29–30.) Givenchy considered Scorzelli for the position, but Hubbell concluded that she was not a "team player" and "was not the right person for that job," despite the fact that she had just received her best performance evaluation. (Weber Supp. 56.1 Stmt. ¶ 12(e); Hubbell Dep. at 28–30; Scorzelli Dep. at 137–38.) According to Weber, after Scorzelli was turned down for the business manager position, Bachman stated in front of Weber and Hubbell that Scorzelli was not qualified for the position because "she's a grandmother and she'[s] too old." (Weber Supp. 56.1 Stmt. ¶ 12(f); Weber Dep. at 117.) Hubbell denied that Bachman made this statement. (Hubbell 2/8/99 Aff. ¶ 9.)

## The Hiring of Melissa Frier as Business Manager [1]

Givenchy moved to the new Macy's counter at the end of February 1995.

---

1. At that time, Frier went by her maiden name of Singer (*see* Frier Dep. at 3); in this

(Givenchy & Weber Supp. 56.1 Stmt. ¶ 9; Kundar 1/11/99 Aff. Ex. 49; Weber Dep. at 65.) One of the first sales events to be held at the new, larger Givenchy counter was the introduction of a new fragrance, Kenzo D'ete. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 9; Hubbell Dep. at 133; Weber Dep. at 95.) Givenchy employed extra rotators for the event and Hubbell offered a rotator position to a childhood friend, 27–year–old Melissa Frier. (Givenchy & Weber Supp. 56.1 Stmt. ¶¶ 9–10; Hubbell Dep. at 21–26, 107; Frier Dep. at 4, 81–83; Weber Dep. at 140–41, 183–84.) Frier began working as a Givenchy rotator at the beginning of March 1995. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 11; Hubbell Dep. at 26.)

Frier soon expressed interest in the open business manager position and, by mid-March 1995, was hired for the position. (Givenchy & Weber Supp. 56.1 Stmt. ¶¶ 11–12.) Frier began working in this position on March 29, 1995, only a couple of weeks after Weber received a discretionary raise. (Weber Supp. 56.1 Stmt. ¶¶ 12, 16(g); Givenchy 56.1 Stmt. ¶ 12; Hubbell Dep. at 27; Kundar 1/11/99 Aff. Ex. 44 at 9980194.)

According to Weber, as business manager, Frier "was armed with decisionmaking input or authority concerning the employment of personnel at the Givenchy counter." (Weber Supp. 56.1 Stmt. ¶ 13(a).) Weber's assertion is based on the fact that, after Weber was discharged, Frier stated to Scorzelli that Scorzelli needed to "watch [her] step because with one phone call [she] would be out of [t]here." (Scorzelli Dep. at 75.) Givenchy contests this assertion and avers that Frier's duties as business manager did not include any authority to hire or fire any rotator; according to Givenchy, this responsibility was left to Hubbell. (Givenchy 56.1 Stmt. ¶¶ 3, 13.)[2]

Opinion, she will be referred to throughout as Frier.

**2.** However, according to Weber, during her employment with Givenchy, she also "arranged for and recommended sales rota-

### Frier's Discriminatory Comments

Weber alleges that, soon after Frier became business manager, Frier "began making negative comments about [Weber's] age" (Am.Compl. ¶ 10), including the following remarks:

(i) Frier stated to Diane Romanelli, a Macy's sales associate, that "she could not relate to [Weber] because of [Weber's] age" and she "needed to surround herself with younger people." (Weber Dep. at 15–16; Weber Supp. 56.1 Stmt. ¶ 13(g)(i).)

(ii) Roxanne Moundrell, a rotator at Macy's for a different perfume company, heard Frier comment, " 'Let the old lady [Weber] stand in front of the counter and spray.' " (Weber Dep. 89, 205–07; Rosenthal Aff. Ex. 20; Weber Supp. 56.1 Stmt. ¶ 13(g)(ii).)

(iii) Weber heard Frier refer to a Givenchy product as "an old lady's fragrance." (Weber Dep. at 17; Scorzelli Dep. at 122–23; Weber Supp. 56.1 Stmt. ¶ 13(g)(vii).)

(iv) Harriet Grana and Diane Drucker, Macy's salespersons at a different counter, overheard Frier state that Weber was too old and that Frier could not " 'relate to Marie Weber because she's old.' " (Grana Dep. at 35–36, 87, 100–01; Rosenthal Aff. Exs. 18 & 19; Weber Supp. 56.1 Stmt. ¶ 13(g)(iv).)

(v) Drucker also heard Frier comment that she was not getting along with Weber, Weber was "too old for this business," and that Frier wanted to get out the "old" and bring in her friends.

tors/promotional models for hire by [Givenchy]." (Weber Supp. 56.1 Stmt. ¶ 3; *see* Weber Dep. at 140–41, 183–84, 241, 267; Hubbell Dep. at 107.)

(Drucker Dep. at 125–26; Weber Supp. 56.1 Stmt. ¶ 13(g)(v).)

(vi) Maureen O'Neill heard Frier state that Weber and others "were all a bunch of old bitches." (Rosenthal Aff. Ex. 17; Weber Dep. at 191–92; Weber Supp. 56.1 Stmt. ¶ 13(g)(iii).)

Additionally, after Weber was fired, Frier allegedly made the following remarks:

(vii) Grana overheard Frier state that " 'Old people should not be in this business.' " (Grana Dep. at 124–25; Weber Supp. 56.1 Stmt. ¶ 13(g)(vi).)

(viii) Joan Ruder, who worked at Macy's, told Grana that she heard Frier comment that she was " 'glad that old bitch [was] out of the store.' " (Grana Dep. at 172; Weber Supp. 56.1 Stmt. ¶ 13(g)(viii).)

### Givenchy Alleges That Weber Had a Poor Attitude and Disruptive Conduct

Givenchy claims that, after Frier became business manager, Weber began to demonstrate a poor attitude and conflicts arose at the Givenchy Macy's counter. (Givenchy 56.1 Stmt. ¶¶ 14, 16; Hubbell Dep. at 53–54, 84.) Within a couple of weeks after she started, Frier complained to Hubbell about Weber. (Weber Supp. 56.1 Stmt. ¶ 13(c); Frier Dep. at 125; Hubbell Dep. at 53–54.) As examples of counter conflicts, Frier described the following incidents at her deposition: "I observed [Weber] going to other counters, and from afar, looking at me and sometimes even pointing at me, pointing, showing another person at another counter like, 'Oh, look that's Melissa' . . . ." (Frier Dep. at 123.) However, Frier admitted that she could not hear what Weber actually was saying. (Frier Dep. at 124.)

Hubbell also claimed to have witnessed Weber creating "little problems" like those described by Frier. (Givenchy 56.1 Stmt. ¶ 15; Weber Supp. 56.1 Stmt. ¶¶ 14(b)-(c), 19(b)-(c); Hubbell Dep. at 56–57, 61.) Hubbell testified that,

I, of course, at first wasn't sure what was going on. Then I witnessed it. I witnessed it more than once and then I sent—well, Janet [Bachman] and I decided we should send someone in to spend the day there and kind of see what was going on. That is firsthand information.

(Hubbell Dep. at 57.) Hubbell and Bachman decided to send in Lauren Bessemer, another Givenchy employee, to "observe the situation" at the counter. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 15; Hubbell Dep. at 59.)

Weber disputes whether Hubbell actually witnessed any alleged "counter conflicts" prior to the decision to bring in Bessemer. After testifying that she had witnessed Weber's disruptive conduct, Hubbell contradicted herself and testified she had informed Bessemer that "there were some instances at the counter, but [Hubbell] hadn't witnessed them . . . ." and that she "spoke to [Bachman] and told her what [she] thought was going on at the counter; what [she] had heard was going on." (Hubbell Dep. at 60–61.)[3]

Bessemer visited the counter on April 11, 1995 in order to "assess [the] situation." (Bessemer Dep. at 42; Hubbell Dep. at 57; Kundar 1/11/99 Aff. Ex. 44 at 9980195; Givenchy & Weber Supp. 56.1 Stmt. ¶ 16.) After observing the counter from the beginning of the day until a little over an hour after lunch, Bessemer reported to Bachman and Hubbell that she "felt that [Weber] was very aggressive and that she was really the ringleader of the group and [Bessemer] didn't know if [Frier] would be strong enough to take hold of

---

3. Givenchy claims there is no conflict in Hubbell's testimony—that she observed incidents but did not tell that to Bessemer so as not to prejudice her. (Givenchy Reply Br. at 7–8.) While a jury could agree, a jury also could find that Hubbell did not actually observe any incidents.

that group the way she should be ...." (Bessemer Dep. at 40, 43.) Although Bessemer had determined that Weber was "aggressive and not being flexible," Bessemer did not suggest to Hubbell and Bachman that Weber be terminated, but rather only that they talk to Weber. (Bessemer Dep. at 42–45, 77–78.)

As an example of Weber's "aggressive" nature, Bessemer described an incident in which Weber began "reprimanding" Frier when Frier and Bessemer returned to the counter late from lunch. (Bessemer Dep. at 34–35; see also Hubbell Dep. at 60–61.)

In contrast, Weber contends that Bessemer was sent in solely to determine why Givenchy's sales numbers were below expectations. (Weber Supp. 56.1 Stmt. ¶¶ 15(a), 16(a); Bessemer Dep. at 22, 28, 77.) Weber also notes that because her shift did not start until after lunch on the day of Bessemer's visit, Bessemer only observed Weber for a little over an hour on this one occasion, and thus had insufficient time to assess the situation. (Weber Supp. 56.1 Stmt. ¶¶ 16(a)-(b); Weber Dep. at 91–92; Bessemer Dep. at 40, 77.) Additionally, both Weber and Frier testified in their depositions that, on the day Bessemer visited the counter, Weber did not talk with Frier when Frier returned from lunch with Bessemer. (Weber Supp. 56.1 Stmt. ¶ 16(c); Weber Dep. at 91–92; Frier Dep. at 55–56.) However, Frier did testify that Weber "was a little upset that we stayed away from the counter ...." (Frier Dep. at 55–56.)

Givenchy admits that, despite Bessemer's assessment of the situation at the Macy's counter, "Weber 'did not have an adverse impact on sales' at the Givenchy counter at any time during her work for Givenchy, right up until the day she was fired." (Weber Supp. 56.1 Stmt. ¶ 16(d), (h); Rosenthal Aff. Ex. C: Givenchy Response to Request to Admit ¶ A.)

### Givenchy's Contention That Weber Failed to Rotate Sales

In April 1995, Frier complained to Hubbell that Weber was skipping Frier in the sales rotation by giving sales to McBean and Scorzelli and not to her. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 17; Frier Dep. at 49; Hubbell Dep. at 53–54; Weber Dep. at 109.) On April 26, 1995, Hubbell spoke with Weber, Scorzelli and McBean about rotating sales fairly. (Weber Supp. 56.1 Stmt. ¶ 17(c); Givenchy 56.1 Stmt. ¶ 17; Hubbell Dep. at 95; Kundar 1/11/99 Aff. Ex. 44 at 09980196.)

In contrast, Weber claims that she was not skipping Frier in the sales rotation. (Weber Supp. 56.1 Stmt. ¶ 17(d); Weber Dep. at 109–10.) Weber also points out that the rotation of sales to the sales associates and Frier, as manager, was not supposed to be equal but, instead, the Macy's sales associates were to get two sales each to every one that Frier was to receive. (Weber Supp. 56.1 Stmt. ¶ 17(a); Scorzelli Dep. at 90–92.) Furthermore, Frier admits that, to the extent Weber was skipping her in the rotation, it did not last for long. (Frier Dep. at 49; Weber Supp. 56.1 Stmt. ¶ 17(b).)

On May 4, 1995, Hubbell witnessed Weber take a sale of Givenchy perfume to another counter to ring up rather than to the Givenchy counter. (Givenchy 56.1 Stmt. ¶ 18; Hubbell Dep. at 98–100; Kundar 1/11/99 Aff. Ex. 44 at 11980197A.) Hubbell spoke to Weber about the incident and Weber explained that the Givenchy counter was too busy. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 18; Hubbell Dep. at 99–100.) Weber testified:

> I recall that it was prior to Mother's Day, and we were very, very busy.
>
> And all the other girls behind the counter, Melissa and Andrea and Lucille were all in turn waiting on line. We only had one register. And they were waiting on line to ring up sales.
>
> And I had a customer that was in a hurry. And I was going to lose the sale if somebody didn't ring it up.
>
> And.... not wanting to lose the sale, I just brought it over to another counter

and someone else rung it up for me, which is sometimes done.

And that's the reason why I did that. But on a normal basis, I would never do that.

But in order to get the sale and to get the customer out of the store, that's what I did.

(Weber Dep. at 119–20; Weber Supp. 56.1 Stmt. ¶ 18(a).) Hubbell did not agree with Weber and felt that, at the time Weber brought the sale to another counter, Frier could have handled the sale because she "was with one customer. She was ringing up that customer and was just about finished." (Hubbell Dep. at 99–100.) Frier admitted that, if there were no salesperson at the Givenchy counter to ring up a sale, "somebody else would have to help that customer." (Frier Dep. at 92–93.)

### Weber's Termination

After waiting a few weeks to see if the situation at the counter would improve, Hubbell determined that the situation was not "getting better." (Givenchy 56.1 Stmt. ¶ 19; Hubbell Dep. at 62, 84–85; Kundar 1/11/99 Aff. Ex. 44 at 9980195.) Hubbell and Bachman concluded that Weber was the cause of the conflict at the Givenchy counter, and they decided to "[d]iscontinue [Weber's] services" as soon as the busy Mother's Day period had ended. (Givenchy 56.1 Stmt. ¶ 19; Hubbell Dep. at 62, 85.) Givenchy "substantially increased [Weber's] work hours" during the busy Mother's Day sales period. (Weber Supp. 56.1 Stmt. ¶ 19(m); Rosenthal Aff. Ex. 45.) On May 15, 1995, Hubbell told Weber that her services were terminated. (Givenchy & Weber Supp. 56.1 Stmt. ¶ 20.) Hubbell claimed that she and Bachman made the decision to fire Weber. (Hubbell Dep. at 52.)

In an undated memorandum addressed to Gail Hammond, a Givenchy employee responsible for paying promotional models, Hubbell wrote the following:

On 5/15/95 I had no choice but to let my freelance rotator, Marie Weber, go.

She had been creating problems at the [Macy's] Herald Square counter, had an unacceptable attitude and displayed a complete lack of ability to be a team player when our new counter structure was in place.

Janet Bachman had two discussions with her about her attitude and I had several conversations with her as well. We tried for 6 weeks to fix this problem but unfortunately Marie [Weber] was not going to be a team player and was going to continue to create a problem working environment at our counter. As a result we had no choice but to let her go.

(Kundar 1/11/99 Aff. Ex. 51; Givenchy & Weber Supp. 56.1 Stmt. ¶ 21.) "Frier did not know that [Weber] was being let go until after it occurred." (Givenchy & Weber Supp. 56.1 Stmt. ¶ 23; Frier Dep. at 62–63.) At the time of her termination, Weber was 59 years old, Frier and Hubbell were 27 years old and Bachman was 38 years old. (Weber Supp. 56.1 Stmt. ¶¶ 12(a)—(b), 19(r).)

Weber contests Hubbell's stated reasons for her termination. First, Weber notes that, during the time that Weber and Frier worked at the Givenchy counter, Hubbell only visited the counter once a month for one or two hours. (Weber Supp. 56.1 Stmt. ¶ 19(y); Hubbell Dep. at 43–44; Frier Dep. at 131; Rosenthal Aff. Ex. D at p. 5.) Furthermore, Weber alleges that "[i]t was [Frier], and not [Weber], who instigated problems, and caused tension and discomfort, at the Givenchy counter," predominantly due to Frier's age-discriminatory comments directed at Weber. (Weber Supp. 56.1 Stmt. ¶ 19(a); Weber Dep. at 250; Drucker Dep. at 120–21; Grana Dep. at 128–29.) Apart from the discriminatory comments, Weber also relies on:

(i) Scorzelli's testimony that after Frier started as business manager, Scorzelli "felt that [she] was under a lot of stress and [she] was threatened," and that, on occasion, Frier

was hard to please and "sometimes [Frier] would just seem annoyed. Sometimes you just couldn't do the right thing no matter how hard you tried" (Scorzelli Dep. at 77–79, 82);

(ii) Diane Drucker's testimony that Frier "just was not very nice" while Weber "was an excellent worker and total team player" (Drucker Dep. at 120–21);

(iii) Harriet Grana's testimony that Frier was "very, very rude" to Weber (Grana Dep. at 35); and

(iv) Grana's further testimony that McBean, Scorzelli and another sales associate told her that there was a lot of tension at the Macy's Givenchy counter due to Frier and that the tension continued after Weber was terminated (Grana Dep. at 147–48, 183–86).

Additionally, in contrast to Hubbell's characterization of Weber as not a "team player," Scorzelli testified that everyone, including Weber, just "did [their] job" at the counter and Scorzelli never heard Weber complain or make any comments about Frier. (Scorzelli Dep. at 78–80.) Grana also testified that "Marie Weber did her job at the counter. She did not lead anyone or tell anyone what to do." (Grana Dep. at 152.) Grana further testified that she never observed Weber and Frier having an argument and it always appeared to her that Weber and Frier were cooperating with each other. (Grana Dep. at 152, 156–57.)

Givenchy replaced Weber with two promotional models, one of whom was in her 20s and the other in her 30s. (Weber Supp. 56.1 Stmt. ¶ 19(z); Hubbell Dep. at 101–07, 118; Frier Dep. at 141–42.)

### ANALYSIS

## I. THE SUMMARY JUDGMENT STANDARD IN EMPLOYMENT DISCRIMINATION CASES

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir.1991); Douglas v. Victor Capital Group, 21 F.Supp.2d 379, 387 (S.D.N.Y.1998) (Stein, D.J. & Peck, M.J.); Johnson v. St. Clare's Hosp. & Health Ctr., 96 Civ. 1425, 1998 WL 236235 at *5 (S.D.N.Y. May 13, 1997) (Peck, M.J.), aff'd, 1998 WL 213203 (S.D.N.Y. April 30, 1998) (Mukasey, D.J.); Morris v. Amalgamated Lithographers, 994 F.Supp. 161, 167 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); Hernandez v. New York City Law Dep't Corp. Counsel, 94 Civ. 9042, 1997 WL 27047 at *6 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); Burger v. Litton Indus., Inc., 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996) (Peck, M.J.), report & rec. adopted by, 1996 WL 609421 (S.D.N.Y. Oct.22, 1996).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, here, the defendants. E.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994); Douglas v. Victor Capital Group, 21 F.Supp.2d at 387; Johnson v. St. Clare's Hosp., 1998 WL 236235 at *5; Morris v. Amalgamated Lithographers, 994 F.Supp. at 167–68; Hernandez v. New York City Law Dep't, 1997 WL 27047 at *6; Burger v. Litton, 1996 WL 421449 at *7.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513; *Chambers v. TRM*, 43 F.3d at 36; *Gallo v. Prudential*, 22 F.3d at 1223; *Douglas v. Victor Capital Group*, 21 F.Supp.2d at 387; *Johnson v. St. Clare's Hosp.*, 1998 WL 236235 at *5; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 167–68; *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *6. The Court draws all inferences in favor of the nonmoving party—here, Ms. Weber—only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Douglas v. Victor Capital Group*, 21 F.Supp.2d at 387; *Johnson v. St. Clare's Hosp.*, 1998 WL 236235 at *5; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 167–68; *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *7; *Burger v. Litton*, 1996 WL 421449 at *7. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37; *Douglas v. Victor Capital Group*, 21 F.Supp.2d at 388; *Johnson v. St. Clare's Hosp.*, 1998 WL 236235 at *5; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 167–68; *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *7.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Doug-*

*las v. Victor Capital Group*, 21 F.Supp.2d at 388; *Johnson v. St. Clare's Hosp.*, 1998 WL 236235 at *5; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 167–68; *Ruiz v. Selsky*, 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997) (Peck, M.J.). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510; *Douglas v. Victor Capital Group*, 21 F.Supp.2d at 388; *Johnson v. St. Clare's Hosp.*, 1998 WL 236235 at *5; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 167–68. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12; *Douglas v. Victor Capital Group*, 21 F.Supp.2d at 388; *Johnson v. St. Clare's Hosp.*, 1998 WL 236235 at *5; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 167–68; *Shaw v. City of New York*, 95 Civ. 9325, 1997 WL 187352 at *2 (S.D.N.Y. April 15, 1997) (Peck, M.J.); *Ruiz v. Selsky*, 1997 WL 137448 at *3.

When a case turns on the intent of one party, as employment discrimination claims often do, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential*, 22 F.3d at 1224; *see also, e.g., Chambers v. TRM*, 43 F.3d at 40; *Douglas v. Victor Capital Group*, 21 F.Supp.2d at 388; *Morris v. Amalgamated Lithographers*, 994 F.Supp. at 168; *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *7. Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. *E.g., Gallo v. Prudential*, 22 F.3d at 1224;

*Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990); *Douglas v. Victor Capital Group,* 21 F.Supp.2d at 388; *Morris v. Amalgamated Lithographers,* 994 F.Supp. at 168; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *7. "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. . . . There must either be a lack of evidence in support of the plaintiff's position . . . or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. *E.g., Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997); *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995); *Douglas v. Victor Capital Group,* 21 F.Supp.2d at 388; *Morris v. Amalgamated Lithographers,* 994 F.Supp. at 168; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *7; *Burger v. Litton,* 1996 WL 421449 at *7; *Engelmann v. National Broad. Co.,* 94 Civ. 5616, 1996 WL 76107 at *7 (S.D.N.Y.Feb.22, 1996). In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.,* 131 F.3d at 312; *see also, e.g., Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legiti-

mate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge' "); *Morris v. Amalgamated Lithographers,* 994 F.Supp. at 168; *Richardson v. Newburgh Enlarged City Sch. Dist.,* 984 F.Supp. 735, 744 (S.D.N.Y.1997); *Cutler v. Parfums Givenchy, Inc.,* 96 Civ. 9070, 1997 WL 634171 at *2–3 (S.D.N.Y. Oct.15, 1997); *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *7; *Scaria v. Rubin,* 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), *aff'd,* 117 F.3d 652, 654 (2d Cir.1997).

## II. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE GENUINE ISSUES OF MATERIAL FACTS EXIST AS TO WHETHER GIVENCHY'S PROFFERED REASON FOR WEBER'S TERMINATION IS A PRETEXT FOR DISCRIMINATION

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see also, e.g., Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993); *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997). The ADEA protects employees who are over 40 years old. 29 U.S.C. § 631(a); *see also, e.g., Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 221 (2d Cir. 1997); *Raskin v. Wyatt Co.,* 125 F.3d at 60.

The burden shifting analysis articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), for Title VII cases is applied to disparate treatment employment discrimination claims under the

ADEA.[4] *E.g., Hazen Paper Co. v. Biggins,* 507 U.S. at 610–14, 113 S.Ct. at 1706–08; *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Renz v. Grey Adver., Inc.,* 135 F.3d at 221; *Raskin v. Wyatt Co.,* 125 F.3d at 60; *Scaria v. Rubin,* 117 F.3d 652, 653 (2d Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).[5]

Under the *McDonnell Douglas* burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also, e.g., O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 310, 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *McDonnell Douglas v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *Lediju v. New York City Dep't of Sanita-* tion, 173 F.R.D. 105, 113–14 (S.D.N.Y. 1997) (Leisure, D.J. & Peck, M.J.); *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8; *Pearson v. Metro–North Commuter R.R.,* 87 Civ. 6389, 1990 WL 20173 at *2 (S.D.N.Y. Feb. 22, 1990) (Wood, D.J.). Establishment of a prima facie case " 'in effect creates a presumption that the employer unlawfully discriminated against the employee.' " *St. Mary's v. Hicks,* 509 U.S. at 506, 113 S.Ct. at 2747 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094); *see also, e.g., Fisher v. Vassar College,* 114 F.3d at 1335; *Scaria v. Rubin,* 117 F.3d at 654; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8.

Once an ADEA plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. *E.g., O'Connor v. Consolidated Coin,* 517 U.S. at 310, 116 S.Ct. at 1309; *St. Mary's v. Hicks,* 509 U.S. at 506–07, 113 S.Ct. at 2747; *Texas v. Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94; *McDonnell Douglas v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 312 (2d

---

4. In a footnote, Weber states that the evidence in this case "likely supports the burden-shifting framework of a mixed-motive case" as set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989), rather than the *McDonnell Douglas* burden-shifting analysis used in a pretext case. (Weber Br. at 18 n. 14.) *See, e.g., Raskin v. Wyatt Co.,* 125 F.3d at 6–63 (applying *Price Waterhouse* mixed motive analysis in ADEA case). Because Weber does not pursue this argument, the Court expresses no opinion as to whether the "mixed-motive" framework is more appropriate here, but in any event, it would not change the Court's analysis or result.

5. The parties have analyzed this action only under the ADEA, on the belief that the *McDonnell Douglas* analysis also applies to the New York City Human Rights Law claim. (*See* Givenchy Br. at 14 n. 8; Weber Br. at 18 n. 15.) As this Court twice has pointed out, "while the cases ... employ the same 'federal' analysis to NYCHRL claims, the 'legislative history' of the NYCHRL makes clear that it is to be even more liberally construed than the federal and state anti-discrimination laws." *Burger v. Litton,* 91 Civ. 0918, 1996 WL 421449 at * 18–19 (S.D.N.Y. April 25, 1996) (Peck, M.J.) (citing cases), *report & rec. adopted by,* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996); *accord, e.g., Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at * 13–19 & n. 10 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); *see also Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.) (quoting *Burger* ), *cert. denied,* —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). Because the parties have only analyzed the case under the federal ADEA standard, for purposes of this motion the Court also will consider only the applicable ADEA standard.

Cir.1997); *Scaria v. Rubin,* 117 F.3d at 654; *Fisher v. Vassar College,* 114 F.3d at 1335; *Chambers v. TRM,* 43 F.3d at 38; *Lediju v. New York City Dep't of Sanitation,* 173 F.R.D. at 114; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8. The burden on the defendant at this phase is one of production rather than persuasion. *E.g., St. Mary's v. Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Texas v. Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096; *Scaria v. Rubin,* 117 F.3d at 654; *Fisher v. Vassar College,* 114 F.3d at 1335; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8.

"Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher v. Vassar College,* 114 F.3d at 1335–36. " 'It is important to note ... that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." ' " *Fisher v. Vassar College,* 114 F.3d at 1335 (quoting *St. Mary's v. Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747); *see also, e.g., Scaria v. Rubin,* 117 F.3d at 654.

If the defendant articulates a non-discriminatory reason, the *McDonnell Douglas* burden-shifting framework drops out of the picture. *See, e.g., St. Mary's v. Hicks,* 509 U.S. at 510, 113 S.Ct. at 2749; *Texas v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Scaria v. Rubin,* 117 F.3d at 654; *Fisher v. Vassar College,* 114 F.3d at 1336. At this point, "[i]n order to defeat summary judgment after such a showing by the defendant, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.,* 131 F.3d at 312; *see also, e.g.,*

*Fisher v. Vassar College,* 114 F.3d at 1336; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir.1995); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 38; *Scaria v. Rubin,* 1996 WL 389250 at *10. In other words, plaintiff must show that defendant's reason was pretextual, and more likely than not discrimination was a reason for the adverse employment consequence. *See, e.g., Scaria v. Rubin,* 117 F.3d at 654; *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 38; *Lediju v. New York City Dep't of Sanitation,* 173 F.R.D. at 114; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8. "Accordingly, a Title VII plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher v. Vassar College,* 114 F.3d at 1339. The Court's role at this stage is to determine whether plaintiff has presented sufficient evidence to support a verdict of discrimination. As the Second Circuit stated:

"When a court comes to consider, either upon defendant's motion for summary judgment, or after a plaintiff's verdict, whether the evidence can support a verdict of discrimination, ... the judge must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination. If so, summary judgment must be denied and/or a jury verdict for plaintiff must be sustained. If not, the defendant is entitled to summary judgment or to the overturning of a plaintiff's verdict as clearly erroneous."

*Stern v. Trustees of Columbia Univ.,* 131 F.3d at 312 (quoting *Fisher v. Vassar College,* at 1347); *see also, e.g., Scaria v. Rubin,* 117 F.3d at 654.

#### A. *Step 1: Plaintiff Weber's Burden to Establish a Prima Facie Case*

In order to establish a prima facie case of age discrimination in violation of the

ADEA, a plaintiff who asserts that she has been wrongfully terminated must show that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties of his position; (3) she was subject to an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. *E.g., Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998); *Raskin v. Wyatt Co.,* 125 F.3d 55, 63–64 (2d Cir.1997); *Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 559 (2d Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998); *Scaria v. Rubin,* 117 F.3d 652, 653–54 (2d Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Aponte v. Citibank, N.A.,* 92 Civ. 4948, 1994 WL 172399 at *2 (S.D.N.Y. May 5, 1994) (Wood, D.J.).

"The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." *Scaria v. Rubin,* 117 F.3d at 654; *accord, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Raskin v. Wyatt Co.,* 125 F.3d at 64; *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 32; *Fisher v. Vassar College,* 114 F.3d at 1335.

It is clear that Weber has met these minimal requirements. Weber obviously is a member of the protected class because she was over 40 years old at the time of her termination. (Weber Supp. 56.1 Stmt. ¶ 19(r); Weber Dep. at 6, 15.) It is undisputed that Weber was qualified for the promotional model position: Givenchy admitted that (a) she was a good worker, (b) she achieved high sales figures, and (c) she received a discretionary raise based on her good performance less than six weeks prior to her termination. (Hubbell Dep. at 52, 66, 69–70; Bessemer Dep. at 40.) Weber obviously suffered an adverse em-

ployment decision since she was fired, and she was replaced by two women under the age of 40. (Hubbell Dep. at 101–07, 118; Frier Dep. at 141–42; Weber Supp. 56.1 Stmt. ¶ 19(Z).) Weber, therefore, has stated a prima facie case of age discrimination. Indeed, Givenchy concedes that Weber has stated a prima facie case. (Givenchy Br. at 15.)

## B. *Step 2: Defendant Givenchy's Burden to State a Legitimate, Non–Discriminatory Reason for Weber's Termination*

The burden thus shifts to Givenchy to articulate a legitimate, non-discriminatory reason for discharging Weber. (*See* cases cited at pages 355 – 56, above.)

Givenchy contends that Weber was discharged because she was " 'creating problems at the Herald Square counter, had an unacceptable attitude[,] displayed a complete lack of ability to be a team player,' " " 'was not sharing her sales properly,' " and " 'was not standing behind [Hubbell's] decision' " to hire Frier as business manager. (Givenchy Br. at 15–16, quoting Kundar Aff. Ex. 51 & Hubbell Dep. at 53.) Givenchy relies on (a) Hubbell's memorandum to Hammond after Weber was fired, (b) Hubbell's personal observations of Weber's poor attitude and disruptive conduct, and (c) Bessemer's observations of the situation at the Macy's counter. (Givenchy Br. at 16.) Givenchy's articulated reason for Weber's termination is sufficient to meet its burden of production. *See, e.g., Raskin v. Wyatt Co.,* 125 F.3d 55, 64 (2d Cir.1997) (" 'perpetuat[ion] and ... exacerbat[ion] of' the factious atmosphere and poor morale in the New York office' " represents a legitimate, non-discriminatory reason for failure to promote plaintiff); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.) ("profound inability to get along with her co-workers ... represents a legitimate, nondiscriminatory reason for an employment decision"), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Neratko v. Frank,* 31 F.Supp.2d 270, 284

(W.D.N.Y.1998) ("His contrariness and inability to get along with employers, supervisors, and co-workers fully qualified as legitimate, nondiscriminatory reasons for the adverse actions."); *Williams v. McCausland,* 90 Civ. 7563, 1995 WL 548862 at *13 (S.D.N.Y. Sept.15, 1995) ("refusal to obey superiors [and] inability to get along with co-workers ... are each, standing alone, sufficient to rebut a prima facie case"); *Wilcox v. Runyon,* No. 94–CV–1921, 1995 WL 468270 at *4 (E.D.N.Y. July 31, 1995); *Devine v. Whelan,* 90 Civ. 6272, 1993 WL 350049 at *3 (S.D.N.Y. Sept.3, 1993) (refusal to cooperate with other employees, failure to carry out responsibilities and "poor attitude" were legitimate, non-discriminatory reasons for terminating plaintiff).

## C. *Step 3: Plaintiff Weber's Burden to Show Pretext for Discrimination*

Once the defendant carries its burden of production by articulating a legitimate, non-discriminatory reason for the plaintiff's discharge, as Givenchy has done here, "[t]he plaintiff then has 'the full and fair opportunity to demonstrate,' ... 'that the proffered reason was not the true reason for the employment decision,'" but was in fact a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). "[T]he plaintiff, in order to defeat summary judgment, must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by age discrimination." *Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 560 (2d Cir.1997), *cert. denied,* ―― U.S. ――, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998); *accord, e.g., Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998); *Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.), *cert. denied,* ―― U.S. ――, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998); *see also St. Mary's v. Hicks,* 509 U.S. at 515, 113 S.Ct. at 2751 (a proffered "reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that dis-

crimination was the real reason"); *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied,* ―― U.S. ――, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Woroski v. Nashua Corp.,* 31 F.3d 105, 108–09 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994).

### 1. *Weber's Rebuttal of Givenchy's Proffered Reasons*

Weber counters Givenchy's articulated reasons in two ways. First, Weber contests the evidence upon which Givenchy relies in support of its nondiscriminatory reasons. Givenchy relies primarily on Hubbell's personal observations of Weber's conduct and Bessemer's assessment of the situation at the counter. (*See, e.g.,* Givenchy Br. at 16.) To rebut Hubbell's claims that she personally observed Weber's conduct, Weber relies on Hubbell's testimony at her deposition that, prior to Bessemer's visit, Hubbell told Bessemer "there were some instances at the counter, but [she] hadn't witnessed them ...." (Hubbell Dep. at 60.) Furthermore, Hubbell admitted that she did not spend a lot of time at the counter while Frier and Weber worked together. (Hubbell Dep. at 43–44; Frier Dep. at 131; Rosenthal Aff. Ex. D at 5.)

Weber rebuts Bessemer's testimony in three different ways. First, Weber presented evidence that, on the one day Bessemer visited the counter, she only observed Weber for a little over one hour. (Bessemer Dep. at 40, 77; Weber Dep. at 91–92.) A reasonable inference that a jury could draw from this evidence is that Bessemer had insufficient information on which to base her conclusion. Second, Weber challenges Bessemer's testimony that she observed Weber reprimanding Frier for returning late from lunch. Weber relies on the fact that both Frier and Weber testified that they did not speak to

each other when Frier returned from lunch. (Weber Dep. at 91–92; Frier Dep. at 55–56.) In response, Givenchy notes that (i) Frier testified that Weber was upset when Frier returned from lunch, and (ii) Bessemer testified that Weber's comments did not "even hit [Frier]" and it was as if Frier were "used to, I don't know, being talked to like that." (Givenchy Reply Br. at 9; Frier Dep. at 55–56; Bessemer Dep. at 35.) Thus, there is at least a factual dispute as to what occurred when Bessemer observed the Macy's counter. Third, Weber argues that the evidence contradicts Bessemer's ultimate conclusion that Weber was the cause of the problem at Macy's. In contrast to Givenchy's contention that Bessemer was sent to Macy's to "observe the situation" at the counter (Givenchy Br. at 8), Weber avers that Bessemer was actually sent in solely to determine why the sales numbers were below expectations. (Weber Br. at 20; Bessemer Dep. at 22, 28, 77.) Accordingly, Weber argues that, if Bessemer's conclusion that Weber was causing the problems at Macy's is viewed in the context of why she was sent in to the store, her conclusion is contradicted by the fact that Givenchy has stipulated that Weber was "not the cause of any shortfall in sales." (Weber Br. at 20; *see also* Rosenthal Aff. Ex. C: Givenchy Response to Request to Admit ¶ A.)[6]

In addition to challenging the evidence on which Givenchy relies, Weber presents evidence that directly contradicts Givenchy's proffered reasons for her termination. To counter Givenchy's claim that Weber was skipping Frier in the sales rotation, Weber points to the fact that Frier admitted that, to the extent that she

perceived Weber was not rotating sales evenly, it did not last long. (Frier Dep. at 49.) Additionally, Scorzelli testified that because Frier was a manager, she only was supposed to receive one sale for every two that was given to Scorzelli and McBean. (Scorzelli Dep. at 90–92.) Furthermore, Weber testified that she was distributing sales evenly. (Weber Supp. 56.1 Stmt. ¶ 17(d); Weber Dep. at 109–10.) Although this last claim is conclusory, "it is no more conclusory than [Frier's] assertion that" Weber had skipped her in the sales rotation. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir.1998). Givenchy only cites one specific instance where it believes Weber actually skipped Frier in the sales rotation—the incident on May 4, 1995 where Hubbell observed Weber taking a sale to another counter. (Hubbell Dep. at 98–100.) However, there is a clear factual dispute as to whether Weber acted improperly on that occasion. In contrast to Hubbell's assertion that Weber could have given the sale to Frier, Weber claimed that everyone at the Givenchy counter was busy. (*Compare* Hubbell Dep. at 100 *with* Weber Dep. at 119–20.) Because her customer was in a hurry, Weber took the sale to another counter, which, Frier admitted, is a proper course to follow if no one is available at the Givenchy counter. (Frier Dep. at 92–93; Weber Dep. at 119–20.)

Weber also refutes Givenchy's claims that Weber "displayed a complete lack of ability to be a team player" and "was not standing behind [Hubbell's] decision" to hire Frier as the business manager. (Kundar Aff. Ex. 51; Hubbell Dep. at 53.) Weber alleges that "it was [Frier] who

---

6. In support of its legitimate non-discriminatory reasons, Givenchy also relies on Hubbell's undated memorandum which articulates several non-discriminatory reasons for Weber's termination. (Givenchy Br. at 15–16.) However, "[i]n assessing the inferences to be drawn from the circumstances of the termination, the court must be alert to the fact that '[e]mployers are rarely so cooperative as to include a notation in the personnel file' that the firing is for a reason expressly forbidden by law." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir. 1989); *accord, e.g., Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). While this contemporaneous memorandum does provide some support to Givenchy's position, it is not dispositive, and issues of fact remain that preclude summary judgment.

caused tension, dissension, and discomfort at the Givenchy counter" based on the discriminatory comments she made about Weber. (Weber Br. at 20.) Weber also points to (i) Scorzelli's testimony that Frier was difficult to work with at times and made her feel pressured and threatened (Scorzelli Dep. at 77–79, 82), (ii) Grana's testimony that Frier was "very, very rude" to Weber (Grana Dep. at 35), and (iii) Drucker's testimony that Frier was not a nice person (Drucker Dep. at 120–21). Scorzelli also testified that everyone at the counter just did their job and she never heard Weber comment or complain about Frier. (Scorzelli Dep. at 78–80.) Additionally, Grana testified that Weber never told "anybody what to do" and, based on her observations, she never saw Weber and Frier in an argument and they always seemed to be cooperating with each other. (Grana Dep. at 138, 152, 156–57.)

Weber also relies on Grana's testimony that Scorzelli and McBean told her that Frier was causing tension at the counter after Weber was fired. (Grana Dep. at 147–48, 183–86.) Givenchy contends that Grana's testimony is inadmissible hearsay and cannot be used by Weber to create a genuine issue of material fact. (Givenchy Reply Br. at 9.) The Court agrees. *See* Fed.R.Civ.P. 56(e) (plaintiff "shall set forth such facts as would be admissible in evidence"); *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 357 (2d Cir.1997); *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 391–92 (S.D.N.Y.1998) (Stein, D.J. & Peck, M.J.) (citing cases). However, even without that hearsay testimony, Weber has presented sufficient evidence to establish disputed questions of fact as to Givenchy's asserted reasons for her termination.

## 2. *A Rational Trier of Fact Could Find That Givenchy's Decision to Terminate Weber Was Motivated in Whole or in Part by Age Discrimination*

Apart from creating genuine issues of fact as to whether Givenchy's proffered reasons for her termination were true, Weber has presented sufficient evidence to allow a rational trier of fact to infer that Givenchy's decision was motivated in whole or in part by age discrimination. Weber presented evidence that she was a good worker, and that her high performance level resulted in a discretionary raise in March 1995. (Hubbell Dep. at 52, 66, 69–70; Bessemer Dep. at 40; Givenchy Reply Br. at 6.) However, less than two months after Weber received the raise, she was fired at age 59 from her position and replaced with two women under the age of 40. (Hubbell Dep. at 101–07, 118; Frier Dep. at 141–42; Weber Dep. at 15.) The only intervening change of circumstances was the hiring of Frier as business manager who, in the six weeks that she worked with Weber, made several discriminatory comments about Weber's age. (Weber Supp. 56.1 Stmt. ¶ 13(g)(i)-(vii).) [7] These included statements by Frier that she could not relate to Weber because of her age and that she would like to get out the old and bring in younger people. (Grana Dep. at 35–36, 87, 100–01; Drucker Dep. at 125–26; Weber Dep. at 15–17, 89, 191–92, 205–07; Scorzelli Dep. at 122–23; Ro-

---

[7]. The Court notes that some of the comments on which Weber relies are hearsay. (*See* Weber Supp. 56.1 Stmt. ¶ 13(g)(i), (ii), (iii) & (viii).) For purposes of this opinion, the Court will consider Givenchy's failure to object to this testimony as a waiver of the objection, especially in light of Givenchy's objection to other hearsay evidence but not to these comments. (*See* Givenchy Reply Br. at 9.) Accordingly, the Court will take into consideration the discriminatory comments that are hearsay, even though not presented in admis-

sible form. The Court assumes that Weber will fix these hearsay problems by the time of trial. *Cf.* Fed. R. Civ. Proc. 56(f). In any event, even if the Court did not consider the hearsay comments, the admissible discriminatory comments plus the circumstances surrounding Weber's termination are sufficient for a rational factfinder to infer that Givenchy's decision was motivated in whole or in part by age discrimination. Genuine issues of material fact exist which prevent summary judgment.

senthal Aff. Exs. 17–20.) Not long after these statements were made by Frier, Weber was dismissed from her position with Givenchy.

Givenchy contends that this evidence does not create an inference of discrimination because Frier was not a decisionmaker, relying on *Corcoran v. GAB Bus. Servs., Inc.*, 723 F.Supp. 966, 970 (S.D.N.Y.1989). (Givenchy Br. at 18.) In support of this argument, Givenchy states that only Hubbell was responsible for the hiring and firing of promotional models and that Hubbell and Bachman made the decision to fire Weber. ' (Givenchy 56.1 Stmt. ¶ 13; Hubbell Dep. at 25, 52.)

Although Frier may not have been the person who made the ultimate decision to fire Weber, a jury could infer from the evidence that Frier had substantial input in the decision-making process. First, and most important, Frier admitted that she complained to Hubbell about Weber. (Frier Dep. at 125; Hubbell Dep. at 53–54.) Second, Weber testified, and Hubbell admitted, that while Weber worked at Givenchy, Weber hired other promotional models and, in other cases, had substantial input in the decision to hire people. (Weber Dep. at 140–41, 183–84, 241, 267; Hubbell Dep. at 107.) This evidence clearly contradicts Givenchy's contention that only Hubbell was responsible for personnel decisions. Moreover, Scorzelli testified that Frier threatened to have her fired with "one phone call." (Scorzelli Dep. at 75.) A reasonable inference that could be drawn from this evidence is that Frier had a role in Givenchy's decision to fire Weber. Thus, her discriminatory comments are relevant to determining whether the decision to terminate Weber was motivated by age-based animus. *See, e.g., Owens v. New York City Housing Auth.*, 934 F.2d 405, 410 (2d Cir.) (statements made by individuals with "substantial influence" over plaintiff's employment raise genuine issue of fact on issue of pretext), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991); *Rosen v. Thornburgh*,

928 F.2d 528, 534 (2d Cir.1991) (finder of fact could find that decision was the product of religious bias, even if the ultimate decision maker was unaware of plaintiff's religion, when biased supervisors 'played a role in the decision); *Ryduchowski v. Port Authority*, No. 96–CV–5589, 1998 WL 812633 at *10 (E.D.N.Y. Nov.19, 1998) (genuine issue of fact existed as to whether employer's proffered reason for failing to promote plaintiff was pretextual where inference could be drawn that someone with a discriminatory motive "influenced" decisionmaker); *Dedyo v. Baker Eng'g New York Inc.*, 96 Civ. 7152, 1998 WL 9376 at *8 (S.D.N.Y. Jan.13, 1998) (denying summary judgment on ADEA claim where "there [was] ample evidence to indicate that, as a practical matter, [the decisionmaker] was very much influenced" by the supervisor who made discriminatory comments about plaintiff); *Hunt v. Tektronix, Inc.*, 952 F.Supp. 998, 1006–07 (W.D.N.Y. 1997) (genuine issue of material fact existed as to pretext where inference could be drawn that non-decisionmaker who made discriminatory comments had larger role in termination than that alleged by defendant); *Azar v. TGI Friday's, Inc.*, 945 F.Supp. 485, 499 (E.D.N.Y.1996) (remarks made by non-decisionmaker constituted direct evidence of discrimination where speaker was plaintiff's superior who conferred with decisionmaker "on a regular basis as to the employees' performance, and, with reasonable certainty he 'advised the General Manager about employee matters such as those involving the plaintiff"); *Marfia · v. T.C.· Ziraat Bankasi*, 903 F.Supp. 463, 468 (S.D.N.Y.1995) (upholding jury verdict which found defendant discriminated against plaintiff where ."the jury could have reasonably found that [alleged non-decisionmaker who made discriminatory comments] influenced the [decisionmaker], thereby 'poisoning the well' "), *vacated on other grounds*, 100 F.3d 243 (2d Cir.1996); *Rieff v. ITT Communication & Information Servs.*, 93 Civ. 1457, 1994 WL 658426 at *4 (S.D.N.Y. Nov.18, 1994) ("[I]f [non-decisionmaker],

as [plaintiff's] supervisor, did engage in machinations directed towards the termination of [plaintiff], and if [non-decisionmaker's] artifice was motivated by religious animus, then this Court concludes that such facts constitute a sufficient nexus between the discriminatory animus and the adverse employment action for Title VII purposes. . . . This would be true, even though the final decision makers . . . made the decision to fire [plaintiff], unaware of either [non-decisionmaker's] machinations or his religious animus"; noting that " 'under certain circumstances, a supervisor's discriminatory animus, innocently relied upon by another official responsible for making firing decisions, can be imputed to the employer' "); *Chase v. I. Walter Thompson Co.*, 89 Civ. 7989, 1992 WL 30934 at \*5 (S.D.N.Y. Feb.13, 1992) (finding it "plausible" that plaintiff was the victim of discrimination where a supervisor who was not plaintiff's immediate supervisor demonstrated age bias and "instructed the agency's department heads to recommend employees for termination"); *see also, e.g., Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir.1998) (comments made by a non-decision-maker constituted evidence of discrimination where "jury could well believe" that the "comments reflected company policy and hence constituted evidence of discrimination"); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1210 (2d Cir. 1993) (discriminatory statements made about plaintiff by various supervisors and managers who were not decisionmakers were properly admitted at trial because "they showed the pervasive corporate hostility towards [plaintiff] and supported her claim that she did not receive a promotion due to her employer's retaliatory animus"); *Buscemi v. Pepsico, Inc.*, 736 F.Supp.

1267, 1270 (S.D.N.Y.1990) (statements expressing aversion to older workers were relevant even though they were uttered by a person not directly responsible for plaintiff's termination where the speaker was an executive whose position concerned personnel policy).

Givenchy also claims that, even if Frier made the discriminatory remarks, they were "stray remarks," insufficient to support a discrimination suit. (Givenchy Br. at 22–23.) Givenchy is correct that "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Danzer v. Norden*, 151 F.3d at 56; *see also, e.g., Ngwu v. Salvation Army*, 96 Civ. 0058–59, 1999 WL 2873 at \*5 (S.D.N.Y. Jan.4, 1999); *O'Connor v. Viacom, Inc.*, 93 Civ. 2399, 1996 WL 194299 at \*5 (S.D.N.Y. Apr.23, 1996) (three isolated remarks by supervisor insufficient to establish pretext; stray remarks "without a demonstrated nexus to the complained of personnel actions, will not defeat" the employer's summary judgment motion), *aff'd mem.*, 104 F.3d 356 (2d Cir. 1996); *Burrell v. Bentsen*, 91 Civ. 2654, 1993 WL 535076 at \*8 (S.D.N.Y.Dec.21, 1993) ("stray remarks in the workplace, statements by nondecisionmakers, and statement by decisionmakers unrelated to the decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving pretext") (internal quotation marks omitted), *aff'd mem.*, 50 F.3d 3 (2d Cir.1995).

The remarks made by Frier, however, were not stray remarks, but were specifically directed at Weber and had a "close nexus" to her termination, as they were stated within weeks of her dismissal.[8] *See,*

---

8. For these same reasons, Givenchy's argument that the remarks are not "linked" to Weber's termination also must fail. (Givenchy Reply Br. at 11.)

The main cases on which Givenchy relies for this argument (Givenchy Br. at 22–23), *Woroski v. Nashua Corp.*, 31 F.3d at 109–10, and *O'Connor v. Viacom, Inc.*, 93 Civ. 2399, 1996 WL 194299 (S.D.N.Y. April 23, 1996), are

distinguishable. In *Woroski*, the discriminatory comments were general statements "not specifically directed toward plaintiffs." *See Woroski v. Nashua Corp.*, 31 F.3d at 110. Similarly, in *O'Connor*, the discriminatory comments were isolated and had no "demonstrated nexus to the complained of personnel actions," and the plaintiff had not refuted the employer's evidence of her deficient job per-

*e.g., Miles v. North General Hosp.,* 998 F.Supp. 377, 385, 387 (S.D.N.Y.1998) (finding that comments such as defendant needed "younger people to cope on the floor" of nursing unit, plaintiff was "too old" to be on a nursing unit and "you wouldn't ... believe how old [plaintiff] is" were not remote, stray remarks); *Cartagena v. Ogden Servs. Corp.,* 995 F.Supp. 459, 463 (S.D.N.Y.1998) (Sotomayor, D.J.) (comments that were "allegedly directed at the plaintiff in connection with a criticism of his work skills, during the time period immediately prior to plaintiffs discharge" were not stray comments); *Hunt v. Tektronix, Inc.,* 952 F.Supp. at 1007 (comments that defendant needed to hire "young aggressive sales engineers and recent college graduates" established inference of discrimination where they were made at sales meetings two months prior to layoffs); *Azar v. TGI Friday's, Inc.,* 945 F.Supp. at 499 (discriminatory comments not stray where they were made by superior who advised decisionmaker on personnel matters related to plaintiff); *Durling v. Undo & Assoc., Inc.,* 91 Civ. 8190, 1993 WL 33645 at *4 (S.D.N.Y. Feb.4, 1993) ("Since the alleged [stray ageist] remarks, spoken [by a supervisor] during a brief four month period [prior to termination], provide some basis for a finding of bias, this matter cannot be resolved without a trial."); *Steinbauer v. Retirement Living Publ'g Co.,* 89 Civ. 5181, 1991 WL 8507 at *8–9 (S.D.N.Y. Jan.22, 1991) (although "isolated comments [alone] would not be sufficient in the Court's view to raise a factual issue ... the Court concludes that plaintiff's evidence tending to refute defendants' proffered reasons for discharging him, combined with the several remarks about age and the various marketing changes made in the magazine [to target a younger audience], is sufficient to create a factual issue which can only be decided at

trial"); *see also Kirschner v. Office of the Comptroller,* 973 F.2d 88, 93 (2d Cir.1992) (quoting *Ostrowski,* below); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992) (" '[S]tray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process ... may indeed persuade the factfinder that the plaintiff has carried his or her ultimate burden of persuasion" under the *McDonnell Douglas* framework); *Garrett v. Kenmore Mercy Hosp.,* No. 96–CV–0472, 1998 WL 89357 at *5 (W.D.N.Y. Feb.23, 1998) (even if comment that defendant " 'need[s] young and new blood in the Human Resources Department' " was stray, it was "indeed probative and may be considered by the fact-finder determining whether the plaintiff has carried her ultimate burden of persuasion").

Moreover, the Second Circuit has made clear that, "[w]hen ... other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer v. Norden Sys., Inc.,* 151 F.3d at 56. When Frier's remarks are placed in the context of the evidence presented in this case—namely that Weber was fired six weeks after receiving a discretionary raise for her good work performance, replaced with two women under 40 and that Frier criticized Weber to the person who fired Weber—Frier's remarks become highly relevant in determining whether Weber's termination was motivated by age-based animus. *See, e.g., Danzer v. Norden Sys., Inc.,* 151 F.3d at 56; *Rosen v. Thornburgh,* 928 F.2d at 534; *Miles v. North General Hosp.,* 998 F.Supp. at 387; *Cartagena v. Ogden Servs. Corp.,* 995 F.Supp. at 463; *Rieff v. ITT Communication & Information Servs.,* 1994 WL 658426 at *4; *Durling v. Uddo & Assoc.,* 1993 WL 33645 at *4; *Chase v. J. Walter*

---

formance. *O'Connor v. Viacom, Inc.,* 1996 WL 194299 at *5. In contrast, Frier made several ageist comments which were (i) specifically directed at Weber, (ii) complained to Hubbell about Weber, leading to Hubbell's

firing Weber, and (iii) the comments were made within weeks of Weber's termination; moreover, here, Weber has presented evidence refuting Givenchy's proffered reason for terminating her.

*Thompson Co.,* 1992 WL 30934 at *5; *Steinbauer v. Retirement Living Publishing Co.,* 1991 WL 8507 at *8–9.

The Court also notes that the fact that Givenchy proffered the same reason—inability to be a team player—for its failure to promote Scorzelli as it did to justify Weber's termination creates an inference that this proffered reason for Weber's termination is pretextual; Bachman's alleged statement that Scorzelli was not promoted because she was a grandmother and too old shows that the reason may have been pretextual in Scorzelli's case, and a reasonable jury could infer that it was pretextual in Weber's case as well.

In short, it is clear to the Court that the cumulative evidence presented by Weber creates genuine issues of material of fact as to whether Givenchy was motivated in whole or in part by age-based animus. In a situation where the intent of the employer is a disputed issue, summary judgment is inappropriate. *See, e.g., Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.) ("plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since '[a]n employer who discriminates is unlikely to leave a "smoking gun," such as a notation in an employee's personnel file, attesting to a discriminatory intent.'"), *cert. denied,* —— U.S. ——, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998); *Gallagher v. Delaney,* 139 F.3d 338, 350 (2d Cir.1998) (Weinstein, D.J.) ("The intent of the employer is a factually disputed matter precluding summary judgment."); *Chambers v. TRM,* 43 F.3d at 37; *Rose v. Port Authority of New York and New Jersey,* 13 F.Supp.2d 516, 522 (S.D.N.Y.1998) ("Since [the] determination [of whether a proffered reason is really a pretext for discrimination] necessarily requires probing into the intent of the employer, the Second Circuit recently has indicated strongly that evaluation of whether a plaintiff has met the third-prong of the *McDonnell Douglas* test is not a question for a judge but for a jury," citing *Gallagher* ). If Weber's evidence is believed a reasonable jury here could infer that Givenchy was motivated in whole or in part by age discrimination against Weber when it fired her.

## CONCLUSION

For the reasons set forth above, Givenchy's summary judgment motion should be denied.

The Court has already ordered the parties to submit the Pretrial Order on March 24, 1999, and the case therefore will be considered trial ready on 24 hours' notice thereafter on Judge Wood's trial calendar.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d

Cir.1983); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72, 6(a), 6(e).

March 24, 1999.